IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 8, 2014

## DANA KEITH WOODS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-09-10     Honorable Donald H. Allen, Judge**

---

**No. W2010-02409-CCA-R3-PC  - Filed October 28, 2014**

---

The Petitioner, Dana Keith Woods, appeals the post-conviction court's denial of relief from his convictions for first degree premeditated murder, felony murder, aggravated burglary, especially aggravated kidnapping, aggravated assault, and attempted first degree murder. The trial court merged the convictions for first degree premeditated murder and felony murder and also merged the convictions for attempted first degree murder and aggravated assault. For his convictions, the Petitioner received an effective sentence of life without the possibility of parole plus fifty years. On appeal, the Petitioner argues that he received ineffective assistance of trial counsel. Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joins. JERRY L. SMITH, J., Not Participating.

Joseph T. Howell, Jackson, Tennessee, for the Petitioner, Dana Keith Woods.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This appeal stems from the shooting death of Terry Dixson and the subsequent shooting and kidnapping of Gwendolyn Steele. In relation to this incident, the Petitioner was indicted for first degree premeditated murder, felony murder, aggravated burglary, especially aggravated kidnapping, aggravated assault, and attempted first degree murder. The underlying facts were summarized by this court on direct appeal as follows:

Ms. Gwendolyn Steele, one of the victims in this case, resided in Jackson and maintained two jobs there. During the morning of August 23, 2004, Ms. Steele was working at her part-time job at a funeral home, when she encountered her ex-fiancé, the [Petitioner]. A brief conversation ensued. The [Petitioner] walked into the office of the funeral home and said "hello" to Ms. Steele, who then replied "hi ." The encounter ended. According to Ms. Steele, she did not know why the [Petitioner] was at the funeral home.

Ms. Steele then proceeded to her full-time job at Jackson-Madison County General Hospital. Around 11:00 or 11:30 a.m. on August 23, the [Petitioner] phoned Ms. Steele at work, asking her how she was and whether she wanted something to eat. Ms. Steele responded that she did not want anything to eat, and the conversation ended.

Ms. Steele worked at the hospital until approximately 7:30 p.m. When she returned home from work, her childhood friend, Terry Dixson, the other victim in this case, had parked his car in front of her house and was sitting on her front porch waiting on her. Ms. Steele knew that Mr. Dixson "was coming by," but she did not know when. Following Ms. Steele's arrival, the two went inside. Mr. Dixson dried his clothes and watched television in Ms. Steele's bedroom, and Ms. Steele watched television in her living room. The two talked periodically throughout the evening. Later in the evening, Ms. Steele went into the bedroom and laid down on the bed to watch television with Mr. Dixson. According to Ms. Steele, Mr. Dixson had his shirt off; he was lying under the covers; she was lying on top of the covers; and she did not know whether Mr. Dixson had any pants on. Ms. Steele testified that, at this time, the doors to her home were locked.

Around 11:00 p.m., Ms. Steele "saw the door move." At first, she thought only that her niece, Tamika Montae Anthony, who also lived in the residence, had come home. However, a few seconds later, "the door came open and [the Petitioner] was standing there." Ms. Steele asked the [Petitioner] why he was in her home, and the [Petitioner] "said something smart" and "turned like he was going to leave. . . ." The [Petitioner] then "turned immediately back around and he started shooting." Steele recalled "multiple" gunshots-six or seven. Ms. Steele testified that she did not own a gun and that there were not any guns in her home.

After the shots were fired, Ms. Steele started screaming. The [Petitioner] then grabbed Ms. Steele by the arm and pulled her across the bed. Ms. Steele was

pleading that she did not want to go; however, the [Petitioner] told her "to come on" and, if she did not comply, he would shoot her again. The [Petitioner] pulled her across her backyard and forced her into his burgundy Ford Explorer, which was parked behind her house. The [Petitioner] began driving around Jackson. Ms. Steele noticed blood on her shirt, and she "could feel blood dripping from [her] chest." She testified that "[her] mind was telling . . . [her] to pull back or to open the door with this hand but [she] couldn't use it. . . ."

The [Petitioner] stopped the vehicle at his house, and Ms. Steele requested to go to the hospital. The [Petitioner] ignored her and went inside the house. By the time she got the vehicle door open and made it to the front porch, the [Petitioner] was already exiting the house, and he ordered her to get back inside the vehicle.

The [Petitioner] pushed Ms. Steele back into the car and drove back to Ms. Steele's house. The [Petitioner] quickly went inside the house. When he returned, he proceeded to a gas station close to Interstate 40. While at the gas station, Ms. Steele observed the gun between the [Petitioner]'s "belt and his pants."

The [Petitioner] got gas and again began driving. He proceeded to Memphis via Interstate 40. Ms. Steele persisted in requesting medical treatment, but the [Petitioner] refused. Once they arrived in Memphis, the [Petitioner] went to his cousin's, Marie Haynes, house and exited his vehicle. The [Petitioner] returned and ordered Ms. Steele to get out of the car and go into the house. Ms. Steele testified that she could not determine whether anyone was inside the house and that the [Petitioner] put her in a bedroom. After a few minutes, the [Petitioner] pulled Ms. Steele from the bedroom and back outside. Ms. Steele did observe some children at this point and heard [Ms. Haynes] ask, "Where are you going?" Ms. Steele was again forced into the automobile.

The [Petitioner] first stopped at a convenience store and then drove back to Jackson. Ms. Steele again requested to go to the hospital, to no avail. According to Ms. Steele, there was "constant verbal abuse" during the ride back to Jackson.

Upon arriving in Jackson, the [Petitioner] drove past Ms. Steele's house and saw Ms. Steele's car at the home. The [Petitioner] tried to call her niece, but no one answered the telephone. The [Petitioner] then drove to his niece's

house and parked there for a few minutes. Neither the [Petitioner] nor Ms. Steele ever went into the house. The [Petitioner] then proceeded to his nephew's house, but he could not get the door open. Once back inside the car, he again drove around the city of Jackson. After observing police cars "lined along the street" near his house, the [Petitioner] again drove to Interstate 40 and proceeded to the Brownsville area. He exited the interstate, turned around, and went back to Jackson.

While returning to Jackson, the [Petitioner] received a call from his mother. She informed the [Petitioner] that the police were at his house, looking for Ms. Steele. The [Petitioner] then placed a call; he told Ms. Steele that he had phoned the police department and was going to "turn his self [sic] in."

The [Petitioner] drove to one of the residences they had visited earlier in the evening. After orders from the [Petitioner], Ms. Steele followed him into the house, where she observed a man named "Gary." Gary refused to let the [Petitioner] leave with Ms. Steele. The [Petitioner] left the residence, and Gary phoned the authorities.

Emergency personnel arrived to assist Ms. Steele, and she was transported to the hospital around 6:30 a.m. Ms. Steele was admitted to surgery, and a bullet was removed from her wrist. Ms. Steele also required additional surgeries to her right shoulder due to a gunshot wound. Ms. Steele testified that she possibly required more surgeries and that two bullets still remained in her body at the time of trial.

Regarding her prior relationship with the [Petitioner], Ms. Steele testified that she had known the [Petitioner] since junior high. She stated that she began dating him in February of 2004 and that the relationship ended in June of 2004. During this time, the two became engaged. According to Ms. Steele she had seen the [Petitioner] several times since their relationship ended but that it was not "a dating-type of relationship[.]" On August 6 or 7, Ms. Steele had an argument with the [Petitioner] and discovered that the [Petitioner] had a key to her house. Following this incident, Ms. Steele had the locks to her home changed. Ms. Steele admitted to having multiple telephone conversations with the [Petitioner] between June and August of 2004.

When Ms. Steele was asked if she knew what happened to the [Petitioner]'s weapon, she stated that she did not know what the [Petitioner] had done with the gun. According to Ms. Steele, she believed the [Petitioner] to be in

possession of the gun "the whole time" on the evening of August 23, and she was afraid of him. She confirmed that she did not voluntarily go with the [Petitioner] and that she did not feel free to go anywhere else. She also stated that the [Petitioner] did not have her permission to come inside her home.

Ms. Steele's neighbors, Ms. Glenda Bonds and her son, Patrick Tyler Burdine, were at home on the night of the shooting. Ms. Bonds described the gunfire as "a round of shots[;]" they were "consistent." Mr. Burdine stated that "[t]hey sound like they were repeating to me."

Ms. Steele's niece, Tamika Montae Anthony, returned to Ms. Steele's house on August 23, 2004, between 11:00 and 11:30 p.m. The door was locked, and she had to use her key to gain entry. When she went inside, she noticed that the "window was up." She went to investigate and discovered that the "air conditioner was on the ground." She "didn't think anything of it[,]" closed the window, and proceeded to her room. As she walked through the house, she observed the door ajar to Ms. Steele's bedroom. She looked toward the room and saw Mr. Dixson lying on the bed naked with his arm hanging off the bed. Ms. Anthony called out for Ms. Steele. After receiving no response, Ms. Anthony went to her room and went to sleep. She woke up around 3:30 a.m. and again went to Ms. Steele's bedroom, where she observed that Mr. Dixson was still in the same position. Ms. Anthony then phoned her aunt, Cinta James. Her aunt, Shonette Johnson, arrived at the house shortly thereafter. The police were contacted and arrived on the scene.

Lieutenant Mike Holt of the Violent Crimes Unit of the Jackson Police Department arrived at the residence at approximately 4:40 a.m. Lieutenant Holt observed Terry Dixson's body in Ms. Steele's bed. He was "lying face up on the bed with his right hand . . . under his head. . . . [H]e had some type of traumatic injury to his head." After moving the body, it was determined that Mr. Dixson had suffered a gunshot wound to the head. Lieutenant Holt also located other blood in the room:

> [I]t looked like as if someone else had been in the bed and also been shot and then coming across him there was a trail of blood drops that went across the comforter as it was pulled or appeared to have been pulled toward his side of the bed or toward the door of the room.

Lieutenant Holt stated that the "trail of blood that came across Mr. Dixson continued out of the bedroom door and out and along the foyer through the living room and appeared to go out the front door and even actually out onto the porch." The blood was later to determined to be Ms. Steele's.

Lieutenant Holt testified that he observed the air conditioner on the ground outside a window of the residence. Next to the window was a gas meter. According to Lt. Holt, the gas meter "appeared to have been disturbed and on the top as though just stepped up onto it."

Blood was also found at Marie Haynes'[s] home, the location where the [Petitioner] and Ms. Steele stopped in Memphis. Ms. Haynes observed a female with the [Petitioner], but she could not identify her. The blood discovered at her home was later determined to be Ms. Steele's.

Mr. Robin James, Cinta James'[s] husband, testified that he was with the [Petitioner] on August 23 just prior to the shooting. According to Mr. James, he and the [Petitioner] were working on the [Petitioner]'s truck. They began at the [Petitioner]'s house and then moved the truck to Mr. James'[s] house. They quit working on the truck around 7:00 or 7:30 p.m. Following their work, they "had a couple of drinks." When asked what the [Petitioner] was drinking and how much he drank, Mr. James stated that the [Petitioner] was drinking vodka mixed with cranberry juice in "large size glasses, maybe twelve ounces" and that the [Petitioner] consumed "probably more than" two drinks and "maybe" as many as five drinks. After drinking, the men were hungry, so they proceeded to Back Yard Burgers restaurant around 9:30 p.m. They ordered food to go, and the [Petitioner] was dropped off at his house.

Following an autopsy, it was determined that Mr. Dixson died from multiple gunshot wounds to the head. The bullet fragments taken from both victims were determined to be "22 caliber long rifle projectiles." A "Remington 22 short cartridge case . . . was . . . identified as recovered from the subject's vehicle." Additionally, a "rifle casing . . . CCI 22 standard" was found at Marie Haynes'[s] house.

Authorities located the [Petitioner] on September 9, and he was placed in the city jail in Jackson. Jeff Shepard, a Violent Crimes Investigator for the Jackson Police Department, interviewed the [Petitioner]. After receiving his Miranda warnings, the [Petitioner] denied shooting Mr. Dixson. He claimed that Ms. Steele pulled a gun on him, that they struggled, and that the gun went

-6-

off. According to the [Petitioner], he gained control of the gun. Then, Ms. Steele appeared to be reaching under the bed for another weapon, and he shot at her twice. He further claimed that he wanted Ms. Steele to receive medical treatment but that she refused. The [Petitioner] also stated that he threw the gun out the window while driving down Interstate 40.

State v. Dana Keith Woods, W2006-00657-CCA-R3-CD, 2007 WL 4530818, at *1-5 (Tenn. Crim. App. Dec. 26, 2007), perm. app. denied (Tenn. May 27, 2008). Following deliberations, the jury convicted the Petitioner as charged, and he received an effective sentence of life without the possibility of parole plus fifty years. Id. at *5. The Petitioner appealed to this court, represented by appellate counsel, and this court affirmed the convictions. Id. at *12.

On January 15, 2009, the Petitioner filed a pro se petition for post-conviction relief. On March 26, 2009, the post-conviction court appointed appellate counsel that represented the Petitioner on direct appeal to represent the Petitioner in the post-conviction proceedings. At the January 8, 2010 post-conviction hearing, May Woods, the Petitioner's mother, testified that she and her other son, Rory Woods, researched and hired trial counsel to represent the Petitioner. Trial counsel represented the Petitioner at his preliminary hearing, trial, and sentencing. Rory[1] sent trial counsel a list of potential witnesses to be called at the Petitioner's trial. May recalled that trial counsel and an investigator spoke with these witnesses about a week before the Petitioner's trial.

May recalled speaking with trial counsel prior to the Petitioner's trial. She expected to be called to testify at trial but was not. She testified at the Petitioner's sentencing hearing. She testified that had she been called to testify at the Petitioner's trial, she would have testified that the Petitioner's truck was at her residence all day on the day of the incident. She acknowledged that the Petitioner came to her house that evening to look for a "piece." She thought the Petitioner meant that he was looking for a part for his truck because he had been doing repairs on it that day. Afterward, the Petitioner took his truck and left. May testified that the victim never got out of the Petitioner's truck or came to her door to ask for help. In fact, May did not know that Ms. Steele was with the Petitioner until Ms. Steele testified as much at the Petitioner's trial. May testified that "as far as [she] knew, [the Petitioner and Ms. Steele] were seeing each other." She believed the Petitioner had permission to enter Ms. Steele's home as if it was his own and that he used his key to enter

---

[1] Because several witnesses share the same last name, we will refer to them by their first names for clarity. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses by their first names is disrespectful, even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by their proper title.

the home on numerous occasions. May testified that she was "surpris[ed]" to learn that trial counsel had told the jury in opening statements that the Petitioner killed Mr. Dixson because the Petitioner was "provoked and surprised by the thought of another man being in bed with [Ms. Steele]."

Rory Woods, the Petitioner's brother, testified that he faxed trial counsel a list of potential witnesses to be called at the Petitioner's trial about a month before trial. The list included Gary Phelps and Kip Cole. He believed that trial counsel talked to "some" but not all of the witnesses on the list. Rory accompanied trial counsel to speak with at least one witness on the list. Rory was not called to testify at the Petitioner's trial. He testified that had he been called to testify, he could have testified that the Petitioner and Ms. Steele were engaged at the time of the shooting. He was with the couple "when they purchased the ring." He testified that Ms. Steele was "flirtatious," and he would not have been surprised to learn that she was "seeing" other men.

Pamela Woods, the Petitioner's sister-in-law, testified that she compiled the witness list given to trial counsel. She also testified that the Petitioner and Ms. Steele were "planning to get married" and that she and her husband, Rory, were with the couple when they purchased "their wedding bands." Trial counsel did not speak with Pamela before trial and she was not called to testify at trial.

Sylvia Brown, the Petitioner's cousin, testified that she knew the Petitioner was dating someone at the time of the shooting but did not know Ms. Steele personally. She recalled that on the night of the shooting, the Petitioner came to her place of employment, Trinity Food Mart, to ask to her switch cars with him. She added, "Th[at] is normal. We do that." Shortly after, the police came to Trinity Food Mart. She recalled that they were "looking for someone" and then asked her several questions about the Petitioner. She told the police that the Petitioner switched cars with her. Trial counsel did not speak to Ms. Brown prior to the Petitioner's trial. She was called as a witness for the State at the Petitioner's trial.

The Petitioner testified that trial counsel was hired by his family, and he met with trial counsel one time prior to his preliminary hearing. He told trial counsel his side of the story but claimed that at the time neither he nor trial counsel knew what the charges were against the Petitioner. The Petitioner acknowledged that his arrest in this case resulted in a probation revocation in another matter. As a result, the Petitioner was incarcerated at the Department of Correction in Hardeman County.

The Petitioner stated that he would see trial counsel whenever the Petitioner came to court for "a motion or something," but never saw trial counsel outside of court. The Petitioner recalled that trial counsel came to see him in prison about a week before trial, and

they discussed the charges and the witness list compiled by the Petitioner's family. The Petitioner did not know whether trial counsel talked to any of these witnesses and noted that trial counsel did not call any witnesses on his behalf at trial. Among the witnesses on the list that the Petitioner thought trial counsel should have called to testify at trial were Gary Phelps, Kip Cole, and Ricky Love. The Petitioner maintained that Ms. Steele was "seeing other people at the time," including Gary Phelps and Kip Cole, which the Petitioner believed was important for his defense because "there were other potential people that came in to do harm." Gary Phelps was deceased as of the date of the evidentiary hearing. The Petitioner claimed that Ricky Love, the store clerk at a gas station where the Petitioner stopped for gas after kidnapping Ms. Steele, could have testified that the Petitioner did not have a gun when he entered the store. The Petitioner maintained that had trial counsel met with him more often, trial counsel would have decided to call these witnesses at trial.

The Petitioner recalled that Ms. Steele testified at the preliminary hearing. He believed her testimony was "different" at the preliminary hearing and trial. He recalled that trial counsel cross-examined Ms. Steele but could not recall whether trial counsel asked her about discrepancies in her testimony. The Petitioner claimed that he did not know the defense strategy until his trial was underway. The Petitioner claimed that he was surprised by trial counsel's opening wherein trial counsel "basically admitted" that the Petitioner shot the victims. He recalled that trial counsel wanted the Petitioner to testify at trial and "show[] a few tears" to get sympathy from the jury, but the Petitioner refused because he "wasn't going to get on the stand and perjure [himself]" by agreeing that he committed a murder that he did not commit.

On cross-examination, the Petitioner stated that he believed the defense "should have been that [he] was innocent" because he did not commit the crimes. According to the Petitioner, Ms. Steele shot Mr. Dixson and herself. If the Petitioner was guilty of anything, "it was helping [Ms. Steele] leave the [scene] of a crime." The Petitioner testified that he never told trial counsel a different version of the facts. The Petitioner acknowledged that he appeared in court at least seven times with trial counsel before trial and never complained to the trial court about trial counsel's representation.

Trial counsel testified that he was hired by the Petitioner's family to represent the Petitioner and met with the Petitioner prior to his preliminary hearing. The Petitioner originally told trial counsel that he did not shoot either victim, but trial counsel did not find his story "very believable." He recalled that he learned a lot about the State's "version" of the facts at the preliminary hearing and cross-examined Ms. Steele in great detail. Through the development of Ms. Steele's testimony at the preliminary hearing, trial counsel began to consider a voluntary manslaughter theory. Trial counsel testified that he discussed with the

Petitioner "trying to develop adequate provocation proof" to obtain a voluntary manslaughter conviction instead of first degree premeditated murder.

Trial counsel obtained open file discovery from the State and sent a copy of everything to the Petitioner. Trial counsel agreed that he met with the Petitioner only one time in prison but stated that he met with the Petitioner numerous times in court. Trial counsel believed that the Petitioner "needed to testify to win," and he advised the Petitioner accordingly, but the Petitioner chose not to testify. Trial counsel acknowledged that he received a witness list from the Petitioner's family. He attempted to contact some of the witnesses and hired an investigator, Ronald Lax, to help him locate additional witnesses.

Trial counsel and Mr. Lax met with the Petitioner on October 3, 2005, a little over a week before the Petitioner's trial was scheduled to begin. During this meeting, the Petitioner told trial counsel a "different version [of the facts] than what [the Petitioner] had said at the beginning." Trial counsel thought the Petitioner's new version of the facts made "so much more sense" with the evidence. Trial counsel filed a motion to continue to gather more information and evidence in light of the Petitioner's new version, but the motion was denied by the trial court. Trial counsel believed that he "could have done better with more time," but he was prepared for trial. The defense did not call any witnesses at trial, but trial counsel recalled that several "people that [the defense] had on a string got called as witnesses" by the State, and trial counsel cross-examined them. Trial counsel agreed that he told jurors during his opening statement that "this wasn't a question of who did it, just why and the circumstances surrounding it." He explained that he believed the defense was "going to struggle for credibility" with jurors and that he discussed this approach with the Petitioner before trial. He recalled that the Petitioner did not express dissatisfaction with trial counsel's opening and stated that he believed the Petitioner "was on board with it."

At the end of the hearing, the court granted the Petitioner's request for a continuance to attempt to locate additional witnesses. A second hearing was held on March 22, 2010, at which the Petitioner introduced an affidavit from Ralph Mercer, the owner of the Mercer Brothers Funeral Home, to rebut Ms. Steele's trial testimony that she worked at the funeral home on the day of the shooting. The court again granted the Petitioner's request for a continuance. A third hearing was held on August 16, 2010. The Petitioner introduced a letter from Sergeant Chester Long that confirmed that trial counsel met with the Petitioner one time while he was incarcerated. Appellate counsel also informed the court that the Petitioner wanted to file some additional amendments to his petition, but appellate counsel did not think the proposed amendments had any merit. The Petitioner was placed under oath and testified that he wanted to present evidence that several witnesses called by the State at trial gave perjured testimony. He claimed that appellate counsel spoke with several witnesses but refused to subpoena them. Appellate counsel informed the court that he spoke with the

witnesses from the Petitioner's witness list, but none had anything beneficial to add to the Petitioner's case.

At the conclusion of the hearing, the court took the matter under advisement and entered an order denying relief on October 26, 2010. The Petitioner, through appellate counsel, filed a timely notice of appeal to this court on November 22, 2010. Subsequently, appellate counsel filed a motion to withdraw as counsel, noting that the Petitioner had filed a complaint against him with the Board of Professional Responsibility and asserted a conflict of interest because appellate counsel had also represented the Petitioner on direct appeal.

On April 15, 2011, this Court entered an order remanding the case to the post-conviction court for a hearing to determine whether the Petitioner waived any conflict of interest with appellate counsel. The court noted that if the Petitioner did not waive the conflict, the Petitioner should be allowed "to amend his post-conviction petition to include any cognizable grounds for relief which may have arisen during the filing of the direct appeal. . . [and] [a]ny evidentiary hearing shall only include grounds presented in the amended petition[,]" in accordance with Frazier v. State, 303 S.W.3d 674 (Tenn. 2010). On April 28, 2011, the Petitioner filed a pro se motion to reconsider, averring that he should be allowed to present all issues at a new hearing. Noting that a Petitioner may not proceed pro se while represented by counsel, this court denied the motion to reconsider on May 5, 2011. On remand, the Petitioner did not waive the conflict of interest, and the post-conviction court allowed appellate counsel to withdraw and appointed new counsel to represent the Petitioner. The court allowed 60 days for the amendment of the petition for post-conviction relief and ordered that the initial denial of relief should stand. New counsel did not file an amended petition raising any additional issues. On December 13, 2011, an evidentiary hearing was held at which the Petitioner presented additional testimony alleging that trial counsel was ineffective. The post-conviction court treated the Petitioner's "Motion to Reconsider" as an amended petition and denied relief in a written order entered on February 3, 2012. The Petitioner again appealed to this court.

On October 19, 2012, the State filed a motion to remand the case to the post-conviction court for an evidentiary hearing on all issues raised in the Petitioner's post-conviction petition. This court granted the State's motion in an order entered on November 5, 2012, and remanded the case to the post-conviction court to allow the Petitioner to amend his petition to include any cognizable grounds for relief that may have arisen at trial or during the filing of the direct appeal and to hold an evidentiary hearing on all issues raised in the original or any amended post-conviction petition. On March 11, 2013, new counsel filed a motion to withdraw as counsel, noting that the Petitioner had reported him to the Board of Professional Responsibility. The motion was granted and the post-conviction court

-11-

appointed subsequent counsel. On May 29, 2013, the Petitioner, through subsequent counsel, amended the petition for post-conviction relief.

An evidentiary hearing was held on August 1, 2013, at which the Petitioner and trial counsel testified.[2] The Petitioner again testified that trial counsel failed to properly investigate his case, failed to call witnesses on his behalf to rebut the testimony of the State's witnesses, and gave an opening statement that incriminated the Petitioner. He averred that trial counsel was unprepared for trial as evidenced by trial counsel's motion to continue, which was filed about a week before trial. The Petitioner also testified that numerous witnesses for the State gave perjured testimony, including Ms. Steele, and complained that trial counsel failed to object to this testimony. Likewise, the Petitioner complained that trial counsel failed to object to the introduction of irrelevant evidence at trial, including the introduction of a shell casing found in the bed of his truck that did not match the bullet that struck the victim. Trial counsel also failed to introduce expert evidence to establish that the fingerprints found on Ms. Steele's air conditioning unit did not match the Petitioner, which would have negated the proof of burglary and prevented his conviction for felony murder.

Trial counsel testified that he moved for a continuance shortly before trial because the Petitioner changed his version of the facts from "Theory A," i.e., that Ms. Steele shot Mr. Dixson and he was already dead when the Petitioner arrived at the scene, to "Theory B," i.e. that the Petitioner shot both victims in the heat of passion. Trial counsel testified that he began investigating this case prior to the preliminary hearing and "was prepared any day for Theory A." He acknowledged that he was not as prepared under Theory B because he only learned this version of the facts one week before trial.

Trial counsel attempted to locate Gary Phelps but was unable to find him. He recalled that the Petitioner was "really fixated" on Mr. Phelps, but trial counsel did not think Mr. Phelps testimony would have been that "useful." Trial counsel did not recall an individual named Ricky Love but stated that he went to the convenience store a couple of times to speak with employees working on the night of the shooting. When asked about perjured testimony by State's witnesses, trial counsel confirmed that he cross-examined the State's witnesses during trial and added, "That's my understanding of what you are supposed to do. There is no objection that they are lying." Regarding his opening statement, trial counsel explained that it was consistent with the Petitioner's new theory and that "it makes sense to gain all the credibility you can with the jury by saying, 'Look, he did it. Now, let's talk about why.'" Trial counsel testified that he discussed this theory with the Petitioner, and the Petitioner

---

[2] The post-conviction court agreed that the August 1, 2013 evidentiary hearing could be used to supplement the prior hearings in the Petitioner's post-conviction action and that evidence and testimony presented at the prior hearings need not be presented again.

wanted to proceed with it at trial. Following the hearing, the court took the matter under advisement and issued an order denying relief on September 4, 2013.

It is from this order that the Petitioner now appeals.

## ANALYSIS

On appeal, the Petitioner argues that he received ineffective assistance of trial counsel and raises numerous grounds in support of his contention.[3] The State responds that the Petitioner failed to prove that trial counsel's performance was deficient or that the Petitioner suffered prejudiced, and therefore, the post-conviction court properly denied relief. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

---

[3] The Petitioner raised a number of additional grounds of ineffective assistance of counsel in his petition, supplemental petition, and amended petition for post-conviction relief that he did not raise as grounds in his brief to this court. We only address those issues that were raised in the Petitioner's brief.

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

The Petitioner first asserts that trial counsel was ineffective because he failed to regularly consult with the Petitioner or properly investigate the Petitioner's case. Specifically, the Petitioner claims that trial counsel met with him only twice before trial and did not begin to investigate the Petitioner's case until one week before trial. The Petitioner maintains that as a result of trial counsel's delay in investigating the Petitioner's case, trial counsel was unprepared for trial, as evidenced by his motion for a continuance filed one week before trial. The Petitioner avers that had trial counsel regularly consulted with the Petitioner and properly investigated his case, trial counsel would have discovered what defenses were available and what witnesses should have been called to testify.

In denying relief, the post-conviction court discredited the Petitioner's contention that trial counsel met with him only twice before trial and found that trial counsel "adequately consulted with [the Petitioner]. . [,] properly investigated the Petitioner's case[,] and was properly prepared for the trial[.]" The court noted that the Petitioner appeared in court with his attorney on at least seven occasions and accredited trial counsel's testimony that trial counsel consulted with the Petitioner about his case on those occasions. The court also noted that the Petitioner never complained to the court that he was dissatisfied with trial counsel's representation or failure to visit the Petitioner in prison. Accordingly, the trial court concluded that the Petitioner failed to establish deficient performance or prejudice arising therefrom. The record supports the conclusions of the post-conviction court.

Although the Petitioner correctly asserts that counsel has a duty to investigate and the "failure to conduct a reasonable investigation constitutes deficient performance," see Burns, 6 S.W.3d at 463, he fails to put forth any facts to support the conclusion that trial counsel's decisions were not reasonable. The record confirms that trial counsel met with the Petitioner on at least seven occasions in court and at least two occasions in prison. Additionally, trial counsel completed full discovery, filed numerous pre-trial motions, and investigated the Petitioner's case, including searching for and interviewing witnesses. Trial counsel testified that he attempted to locate all individuals on the witness list provided to him, and the witnesses were either unable to be located or had nothing to add to the Petitioner's case. The Petitioner failed to present any evidence to refute trial counsel's testimony or establish that trial counsel's preparation was not reasonable.

Moreover, trial counsel's motion for a continuance filed one week before trial does not establish, as the Petitioner contends, deficient performance by counsel. Trial counsel testified that the Petitioner initially told him that he was innocent of the crimes and maintained his innocence until one week before trial. Indeed, in a letter dated August 21, 2005, a little over one month before the Petitioner's trial was scheduled to begin, the Petitioner continued to assert his innocence to trial counsel. As such, trial counsel tailored his investigation and trial strategy to align with the Petitioner's version of the facts, despite

-15-

trial counsel's doubts about the Petitioner's story. Trial counsel testified that the Petitioner changed his version of the facts one week before trial, and, as a result, trial counsel filed a motion for a continuance to investigate the case and change his trial strategy in light of the Petitioner's new version of the facts. Although the Petitioner denied changing his version of the facts and testified at the post-conviction hearing that he was innocent of the crimes, the post-conviction court accredited trial counsel's testimony over that of the Petitioner. We will not reweigh or reevaluate this evidence on appeal. See Vaughn, 202 S.W.3d at 115. Given these circumstances, we cannot conclude that trial counsel's decision to change trial strategies one week prior to trial was unreasonable. See Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."); cf. State v. Zimmerman, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991) (holding that trial counsel's sudden and unjustified "abandonment of the pre-established and reasonably sound defense strategy" was deficient). The Petitioner has failed to establish deficient performance by trial counsel in this regard.

In a similar vein, the Petitioner asserts that trial counsel was ineffective by failing to call witnesses on his behalf at trial. Specifically, the Petitioner complains that trial counsel did not call six[4] witnesses: May Woods, Rory Woods, Pamela Woods, Ricky Love, Kip Cole, and Gary Phelps.[5] As an initial matter, we note that the Petitioner failed to call Ricky Love, Kip Cole, or Gary Phelps to testify at the post-conviction hearing despite numerous continuances to enable the Petitioner to locate these witnesses.[6] This court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The

---

[4] During his evidentiary hearings, the Petitioner complained of trial counsel's failure to call various other witnesses at trial; however, the Petitioner's brief only mentions these six individuals. Accordingly, we do not address trial counsel's failure to call any other proposed witnesses.

[5] In his brief, the Petitioner references "Gary Woods" rather than "Gary Phelps." No where throughout the Petitioner's post-conviction petitions or evidentiary hearings is Gary Woods mentioned as a potential witness. Accordingly, we do not address trial counsel's failure to call Gary Woods on appeal. See T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]").

[6] The record reflects that the Petitioner was granted multiple continuances throughout his post-conviction action to allow the Petitioner to locate additional witnesses to testify at his evidentiary hearing. These witnesses were never presented in any of the hearings, and at the final hearing on August 1, 2013, the Petitioner offered no explanation for the witnesses' absences.

presentation of the witness at the post-conviction hearing is typically the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Neither the post-conviction court nor this court may speculate on "what a witness's testimony might have been if introduced by defense counsel." Id. Trial counsel testified that he attempted to locate the witnesses on the witness list provided to him by the Petitioner's family. The post-conviction court credited trial counsel's testimony that he either spoke to the witnesses and they had nothing to add to the Petitioner's case or he was unable to locate them. The Petitioner's failure to present these witnesses precludes his ability to establish that these witnesses were material to his defense and could have been discovered but for trial counsel's neglect in his investigation. See Black, 794 S.W.2d at 757.

Regarding the three witnesses that testified at the evidentiary hearing, May Woods, Rory Woods, and Pamela Woods, the post-conviction court concluded that the Petitioner failed to establish deficient performance or prejudice arising from trial counsel's failure to call them as witnesses. The court noted that by the Petitioner's own admission, the only people who knew what happened inside Ms. Steele's home that evening were the two victims, Ms. Steele and Mr. Dixson, and the Petitioner. Indeed, Rory and Pamela could only testify about the relationship between the Petitioner and the victim but had no information about the events of the night of the shooting. Likewise, May testified that the Petitioner and Ms. Steele were "seeing each other," but offered very little testimony about the night of the shooting. She testified that the Petitioner's truck was at her home most of the day, but he left that evening and took his truck with him. She stated that she did not see Ms. Steele in his truck, and Ms. Steele did not come to her door to ask for help.

Like the post-conviction court, we do not see how trial counsel's failure to call these witnesses was deficient or prejudiced the Petitioner's defense. Although Ms. Steele claimed that her relationship with the Petitioner ended prior to the shooting, she never denied that she was engaged to the Petitioner at one point. Additionally, she never testified that May, Rory, or Pamela saw her after she was kidnapped by the Petitioner or that she asked any of them for help. In sum, the testimony of May, Rory, and Pamela offers little, if any, weight to the Petitioner's defense. Further, the Petitioner failed to ask trial counsel why he did not call May, Rory, or Pamela to testify at trial. "'[W]ithout counsel's testimony on this issue, we

would be forced to speculate about the reasoning behind [counsel's] decision and whether any prejudice resulted from [counsel's] actions.'" Steven James McCain v. State, No. M2013-00992-CCA-R3-PC, 2014 WL 3659976, at *12 (Tenn. Crim. App. July 23, 2014) (quoting State v. Charles Edward Wagner, No. E2012-01144-CCA-R3-CD, 2014 WL 60971, at *17 (Tenn. Crim. App. Jan. 8, 2014)). The Petitioner is not entitled to relief on this issue.

The Petitioner filed a supplemental brief in this action, alleging that trial counsel provided ineffective assistance of counsel by (1) failing to impeach the victim, Ms. Steele, with testimony from Ralph Mercer that Ms. Steele did not work at his funeral home on the day of the shooting; (2) failing to strike potential jurors that had connections to the victims; and (3) failing to present proof to the jury that the shell casings found in the bed of the Petitioner's truck did not match the shell casings used to the commit the crime. However, the Petitioner did not raise these grounds in his petition and they were not considered by the post-conviction court.[7] "Generally, with respect to those seeking post-conviction relief, this court will not address post-conviction issues that were not raised in the petition or addressed in the post-conviction court." Rickman v. State, 972 S.W.2d 687, 691 (Tenn. Crim. App. 1997) (citing Brown v. State, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996)); see also, T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"). Moreover, the Petitioner's supplement brief fails to support his grounds for relief with argument, citation to authorities, or references to the record. It is well-established that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See Tenn. Ct. Crim. App. R. 10(b). Accordingly, we conclude that these issues are waived.

## CONCLUSION

Based on the foregoing authority and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE

---

[7] In the Petitioner's First Amended Petition for post-conviction relief, the Petitioner alleges that trial counsel failed to object to the introduction of irrelevant evidence. He specifically argues that trial counsel should have objected to the introduction of a shell casing that was found in the bed of his truck because it did not match the bullet that struck the victim. Although similar to the issue raised in his supplemental brief, this issue was not raised on appeal, and therefore, we do not address it.